**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DANIEL R. THOMAS,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| vs. | : | **NO.   21-cv-3547** |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

**<u>MEMORANDUM OPINION</u>**

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                    December 22, 2022

Plaintiff Daniel R. Thomas brought this action seeking review of the Commissioner of
Social Security Administration's decision denying his claim for Social Security Disability
Insurance (SSDI) benefits and Supplemental Security Income (SSI) benefits under Titles II and
XVI of the Social Security Act, 42 U.S.C. §§ 401–433, 1381–1383f.  This matter is before me
for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's Request
for Review (ECF No. 10) is **GRANTED**, and the matter is remanded for further proceedings
consistent with this memorandum.


**I.      PROCEDURAL HISTORY**

Plaintiff protectively filed for SSDI and SSI, alleging disability since July 5, 2019, due to
a heart attack, "drop foot right foot" and nerve damage in the right foot.  (R. 332).  Plaintiff's
applications were denied at the initial level and upon reconsideration, and Plaintiff requested a
hearing before an Administrative Law Judge (ALJ).  (R. 181-89, 197-210).  Plaintiff, represented
by counsel, and a vocational expert testified at the October 23, 2020 administrative hearing.  (R.

85-112).  On November 4, 2020, the ALJ issued a decision unfavorable to Plaintiff.  (R. 64-84).

Plaintiff appealed the ALJ's decision, and the Appeals Council denied Plaintiff's request for

review on June 8, 2021, thus making the ALJ's decision the final decision of the Acting

Commissioner for purposes of judicial review.  (R. 1-6).

On August 9, 2021, Plaintiff filed a complaint in the United States District Court for the

Eastern District of Pennsylvania.  (Compl., ECF No. 1).  On September 13, 2021, Plaintiff

consented to my jurisdiction pursuant to 28 U.S.C. § 636(C). (Consent Order, ECF No. 4).  On

February 10, 2022, Plaintiff filed a Brief and Statement of Issues in Support of Request for

Review.  (Pl.'s Br., ECF No. 10).  On March 14, 2022, the Commissioner filed a Response, and

on March 25, 2022, Plaintiff filed a Reply.  (Resp., ECF No. 11; Reply, ECF No. 12).

## II.      FACTUAL BACKGROUND[1]

Plaintiff was born on February 18, 1989, and was 29 years old on the alleged disability

onset date.  (R. 76).  He graduated from high school.  (R. 76, 333).  Plaintiff previously worked

as a maintenance technician, in sales at a department store and in a processing center, and in a

warehouse.  (R. 333).

### A.      Medical Evidence

On May 31, 2018, while awaiting treatment in the emergency room for chest pain,

Plaintiff had a heart attack, was coded and received extracorporeal membrane oxygenation

(ECMO) while a stent was placed.  (R. 424, 505).  He was ultimately weaned off ECMO but

---

[1]  Plaintiff's Request for Review does not concern the ALJ's findings regarding his heart attack except insofar as it relates to his other allegedly disabling conditions, his right foot drop and nerve damage.  Accordingly, the Court only addresses the evidence regarding his heart attack as it relates to these conditions.

suffered a right superficial femoral artery thrombosis associated with rhabdomyolysis on June 5, 2018.  (R. 505-10).  Plaintiff was discharged on June 13, 2018, with a stable but improving right foot drop with increased strength and the ability to walk if careful.  (R. 506).  He was referred to specialists in pain management and cardiology, among other fields.  (*Id.*).  Plaintiff then received home health nursing and wound care until July 16, 2018.  (R. 620-84).

On June 29, 2018, at a post-discharge follow-up visit with cardiologist John Doherty, M.D., Plaintiff had neuropathic pain with continued right-sided foot drop, for which he was wearing an ankle boot.  (R. 1088, 1090).  On July 2, 2018, he saw his primary care physician, Richard Mandel, D.O., regarding his recent heart attack.  (R. 1042).  Upon examination, Plaintiff had symmetrical alignment of major joints and spine, full range of motion, full motor strength in major muscle groups, a normal gait, and right foot drop.  (R. 1045).  It was further noted that he could manage his personal care, shop, prepare meals, perform housework without assistance and drive.  (R. 1043).  Dr. Mandel referred Plaintiff for neurology for his right foot drop.  (R. 1046).

On July 20, 2018, Plaintiff treated with Charles Rowland, C.R.N.P., for his right groin wound from the ECMO and right foot drop and neuropathic pain.  (R. 756).  Plaintiff's Gabapentin dose was increased and he was referred to physical therapy for his right foot drop and to the pain clinic for further assessment.  (R. 759).

On July 30, 2018, Plaintiff visited Andrew Ng, M.D., a pain management specialist, for right foot drop, hyperesthesia, numbness and "severe[,] burning" pain in his right leg between the thigh and foot.  (R. 771).  He reported having participated in one session of physical therapy but stopped because at-home therapy was denied by his insurance company.  (*Id.*).  He also reported having tried Gabapentin but it had made him drowsy.  (*Id.*).  He wore an ankle foot orthotic at the appointment.  (R. 773).  Upon examination, he demonstrated an abnormal gait and

decreased strength in the right greater toe extension and ankle dorsiflexion.  (*Id.*).  Dr. Ng

diagnosed right foot drop, neuropathic pain and "personal history of ECMO."  (R. 773).  He

prescribed Lyrica and lidocaine and referred Plaintiff to physical therapy.  (R. 774).  Plaintiff

also visited Dr. Mandel on this date for a checkup and complained of residual nerve pain

following his ECMO.  (R. 1048).  He reported stopping Neurontin for lidocaine.  (*Id.*).  He also

stated that he could independently engage in personal care, shop, do housework and drive.  (R.

1049).

Plaintiff underwent a physical therapy evaluation on August 13, 2018, for numbness,

tingling and pain in his right lower extremity.  (R. 1340).  He reported that pain increased with

weight bearing.  (*Id.*).  The examination revealed "trace strength in the ankle dorsiflexors, along

with decreased strength in the L4-5 myotomes [and] impaired sensation . . . throughout the RLE

[right lower extremity]."  (R. 1342).  On a one-to-five scale, Plaintiff's strength was three in

inversion, four-minus in eversion and four in plantarflexion.  (R. 1341).  The L4-5 myotomes

were weaker on the right than on the left side and he had a "complete lack of sensation in the

medial thigh (L3 dermatome)."  (*Id.*).

Plaintiff visited cardiologist Marc Tecce, M.D., on August 28, 2018, to establish care.

(R. 836).  Plaintiff's "[c]ardiac examination [was] unremarkable."  (R. 839).  Dr. Tecce recorded

that Plaintiff had made "an excellent" and "miraculous recovery" following his heart attack and

expressed that he was "delighted" with Plaintiff's cardiac condition.  (*Id.*).  In subsequent visits

between November 2018 and July 2020, Dr. Tecce diagnosed, *inter alia*, neuropathic pain,

femoral nerve damage from ECMO, and resulting chronic right foot drop.  (R. 811-1023, 1314-

32).  Dr. Tecce also prescribed Lyrica.  (R. 918).

On September 24, 2018, Plaintiff visited Dr. Ng for a follow up and reported that his pain and weakness had improved but that he still had right foot drop and pain on the inner side of his right thigh and the tops of his right foot and right knee.  (R. 785).  A physical examination revealed no muscle strength in the right ankle flexion but equal sensation bilaterally in his lower extremities.  (R. 786).  Dr. Ng increased Plaintiff's Lyrica dosage to 150 milligrams.  (*Id.*).  On this date, Plaintiff also saw Dr. Mandel, who advised Plaintiff to exercise and referred him to neurology, as Dr. Mandel did again at visits in December 2018 and March 2019.  (R. 1058-59; 1063-64; 1069-70).  At a March 2020 visit, Dr. Mandel described Plaintiff's right foot drop as "stable."  (R. 1085).

On October 25, 2019, consultative examiner Lee Saltzgaber, M.D., noted that Plaintiff "has a permanent right foot drop secondary to catheter placement in the right groin with right femoral nerve damage affecting L3-L4 distribution."  (R. 797).  Plaintiff reported sharp pain in his right leg from the thigh to the foot.  (*Id.*).  He described the pain as six out of 10 at baseline but increasing to eight out of 10 at its worst.  (*Id.*).  The pain worsened with cold or standing and improved with massage.  (*Id.*).  His activities of daily living (ADLs) included personal care, watching television and listening to the radio.  (R. 798).  Dr. Saltzgaber observed that Plaintiff must raise his right foot "significantly" to walk without his brace but has "an antalgic gait just minimally" when wearing it.  (*Id.*).  He could squat fully, had a normal stance and required no assistance getting in or out of a chair or on or off the examination table.  (*Id.*).  He exhibited decreased sensation between his right thigh and foot and decreased dorsiflexion and plantar flexion in his right ankle.  (R. 799, 808).

Based on these observations, Dr. Saltzgaber opined that Plaintiff could: only occasionally lift and carry between 20 and 100 pounds; frequently lift and carry between 10 and 20 pounds;

continuously lift and carry less than 10 pounds; sit for four hours at a time and eight hours in a workday; sit or stand for three hours at a time and eight hours in a workday; frequently use his hands bilaterally for all manipulations; frequently use left-sided foot controls but never right-sided ones; balance and stoop at least frequently; occasionally kneel, crouch and climb stairs and ramps; never crawl or climb ladders or scaffolds; and occasionally be around unprotected heights but frequently tolerate all other environmental conditions.  (R. 801-05).  He further opined that Plaintiff could perform all activities listed on the form.  (*See* R. 806).

On November 19, 2019, State agency medical consultant Edwin Malloy, M.D., opined that Plaintiff can lift and carry 10 pounds frequently and 20 pounds occasionally; sit or stand and/or walk for six and four hours, respectively, in an eight-hour workday; frequently climb ramps and stairs, stoop, and crouch; and occasionally kneel and crawl but never climb ladders, ropes, or scaffolds.  (R. 130-31).  On July 10, 2020, upon reconsideration, David Paul Hutz, M.D., opined that Plaintiff can lift and carry 10 pounds frequently and 20 pounds occasionally; sit or stand and/or walk for six and four hours, respectively, in an eight-hour workday; frequently climb ramps and stairs and stoop; occasionally kneel, crouch and crawl; but never climb ladders, ropes, or scaffolds.  (R. 159-60).

On January 14, 2020, Dr. Tecce completed a Lower Extremities Questionnaire that Plaintiff had diagnoses for, *inter alia*, "[right] femoral nerve damage from ECMO machine used for circulatory support" following his heart attack.  (R. 1024).  Dr. Tecce identified relevant clinical findings as abnormal gait due to right foot drop, the resulting need for a brace, and right lower extremity limited range of motion, joint deformity, and muscle weakness and atrophy.  (R. 1025).  However, he noted that Plaintiff could "ambulate effectively" in all circumstances described on the form.  (R. 1027).  He opined that Plaintiff could stand and walk for one hour

and sit for four hours in an eight-hour workday, but that he would have to get up to move around for 15-minute unscheduled breaks every one to two hours. (R. 1027, 1029). He further opined that Plaintiff could occasionally lift and carry up to 10 pounds and frequently up to five pounds, occasionally use foot controls, and frequently push and pull using his lower extremities. (R. 1028). Dr. Tecce predicted that Plaintiff's right leg pain might worsen with competitive work, that it would occasionally interfere with his attention and concentration, and that it would cause him to miss work two to three times per month. (*Id.*). He also noted that Plaintiff's pain was constant but worsened with walking. (R. 1029).

On September 10, 2020, Dr. Mandel noted in a Multiple Impairment Questionnaire that Plaintiff has diagnoses for right foot drop and nerve damage, resulting in constant pain in his right foot and leg that is aggravated by standing and sitting. (R. 1335-36). He opined that in an eight-hour day Plaintiff can sit or stand and walk less than one hour and that he can never lift or carry any weight. (R. 1337). He further opined that Plaintiff can frequently use his hands and arms. (R. 1337). He predicted that Plaintiff's symptoms would likely increase with competitive work, that they would frequently interfere with his attention and concentration, that he would require unscheduled breaks and that he would be absent from work more than three times per month. (R. 1338-39).

### B.   Non-Medical Evidence

The record also contains non-medical evidence. In an Adult Function Report dated August 27, 2019, Plaintiff described his ADLs as taking medication, feeding his children, putting them down for naps, watching television, playing with his children, cooking dinner, putting his children to bed and relaxing the rest of the evening. (R. 364). He also takes care of pets with the assistance of his wife, cleans, washes dishes and does laundry. (R. 364-65). He is able to shop

online and can drive short distances occasionally but must avoid highways.  (R. 366).  He attends church weekly.  (R. 367).  He checked boxes on the form indicating problems with squatting, standing, walking, sitting, kneeling, stair climbing and seeing.  (R. 368).  He wears a brace while walking but can walk a few blocks before needing to stop and rest for five to 10 minutes.  (R. 368-69).

At the October 23, 2020 administrative hearing, Plaintiff testified that he suffered nerve damage and foot drop after receiving ECMO following a heart attack.  (R. 95).  He explained that the medical staff "severed the nerve" "when they put the hose through," resulting in "nerve damage going down [his] whole right leg" and an inability to move his ankle.  (R. 96).  His pain improved with medication, but "nothing has changed" "in terms of . . . lifting or anything" since onset.  (*Id.*).  Because of this condition, he can drive only "short communal drives" and he has to lift "his whole right side" to walk.  (R. 92, 96).  To walk outside he must wear a brace, which locks his ankle into place and helps to prevent him from tripping, but it also limits his movement. (R. 97).  He is capable of walking "a couple of blocks" with the brace on.  (*Id.*).  He described "shooting" and "stabbing pains" running from below his groin to his foot.  (R. 97-98).  Lyrica "helps a lot" and some days are better or worse than others.  (R. 98, 103).  Drs. Tecce and Mandel both warned him not to overexert himself.  (R. 99).  Plaintiff can stand but must lean to one side.  (R. 100).  He can only sit "at the longest an hour."  (R. 105).  He can shop by himself but only lift "very small stuff" like a gallon of milk or bread.  (R. 100).  He can load the dishwasher, wipe down counters, and fold laundry, but his wife and extended family help with many tasks.  (R. 101-02).  He plays with his children but cannot "go around running after them." (R. 102).

### III.    ALJ'S DECISION

Following the administrative hearing held on October 23, 2020, the ALJ issued a decision in which he made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2022.

2.    The claimant has not engaged in substantial gainful activity since May 31, 2018, the alleged onset date.

3.    The claimant has the following severe impairments: obesity, residual effects of myocardial infarction, including the foot drop right lower extremity, hypertension, and coronary artery disease.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except he can sit up to 8 hours a day, but only up to 1 hour at a time; he can stand and walk up to 2 hours a day, but only up to 15 minutes at one time; he must have a 15-minute break in the morning and again in the afternoon, and a 30-minute lunch break in addition; he can frequently reach, handle, finger, feel, push, and pull with bilateral upper extremities; no pushing or pulling with the lower extremities; no climbing ladders, ropes, or scaffolds, or crawling, but all other occasional postural maneuvers; avoid concentrated exposure to extreme temperatures, humidity, vibration, pulmonary irritants, and

hazards.

6.      The claimant is unable to perform any past relevant work.

7.      The claimant was born on February 19, 1989 and was 29 years old, which is

        defined as a younger individual 19-44, on the alleged disability onset date.

8.      The claimant has at least a high school education.

9.      Transferability of job skills is not an issue in this case because the claimant's past

        relevant work is unskilled.

10.     Considering the claimant's age, education, work experience, and residual

        functional capacity, there are jobs that exist in significant numbers in the national

        economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security

        Act, from May 31, 2018, through the date of this decision.

(R. 64-84).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 78).


## IV.   LEGAL STANDARD

        To be eligible for benefits under the Social Security Act, a claimant must demonstrate to

the Commissioner that he cannot engage in substantial gainful activity because of a medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. §

1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity.  If she is not, then the
> Commissioner considers in the second step whether the claimant has
> a "severe impairment" that significantly limits her physical or
> mental ability to perform basic work activities.  If the claimant
> suffers a severe impairment, the third inquiry is whether, based on

the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform her past work. If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The disability claimant bears the burden of establishing steps one through four. If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner at step five to establish that, given the claimant's age, education, work experience, and mental and physical limitations, he is able to perform substantial gainful activities in jobs existing in the national economy. *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited. A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted). Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986). The court has plenary review of legal issues. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V.      DISCUSSION

In his request for review, Plaintiff raises two claims: (1) the ALJ failed to properly evaluate the medical opinions of two treating physicians in determining his residual functional capacity (RFC); and (2) the ALJ failed to properly evaluate Plaintiff's subjective statements. (Pl.'s Br., ECF No. 10, at 3-17).

### A.      Treating Physicians' Medical Opinions

In his first issue raised, Plaintiff claims that in determining Plaintiff's RFC the ALJ failed to properly evaluate the medical opinions of two physicians who treated Plaintiff during the relevant period, Drs. Tecce and Mandel.  The Acting Commissioner responds that substantial evidence supports the ALJ's evaluation of the opinions.  Plaintiff replies that the ALJ substituted her own judgment for that of Drs. Tecce and Mandel and, moreover, cherrypicked from the record to support her erroneous conclusions.  Because I agree with Plaintiff that the ALJ's determinations are not supported by substantial evidence, I shall remand the matter.

"The new regulatory scheme [applicable to claims filed on or after March 27, 2017] instructs that the ALJ 'will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s), including those from [the claimant's] medical sources.'"  *Cheryl F. v. Kijakazi*, No. 3:20-cv-16052, 2022 WL 17155681, at *10 (D.N.J. Nov. 22, 2022) (citing 20 C.F.R. § 404.1520c(a)).  Under this new scheme, the ALJ must evaluate the persuasiveness of the opinion, whether from a treating source or not, pursuant to the five factors set forth in 20 C.F.R. §§ 404.1520c(c) and 419.920c(c).  *See Lawrence v. Comm'r of Soc. Sec.*, No. 3:21-cv-01239, 2022 WL 17093943, at *4 (M.D. Pa. Nov. 21, 2022) ("Rather than assigning weight to medical opinions, [an ALJ] will articulate how persuasive he or she finds the medical opinions.") (citations and quotations omitted).  Among

these five factors, supportability and consistency are the "most important." 20 C.F.R. §§
404.1520c(b)(2), 416.920c(b)(2); *accord Lawrence*, 2022 WL 1709343, at *10. "Therefore, [the
ALJ] will explain how [he or she] considered the supportability and consistency factors for a
medical source's medical opinions . . . in [the] determination or decision . . . ." 20 C.F.R. §§
404.1520c(b)(2), 416.920c(b)(2).

      **1.**     **Dr. Tecce**

In relevant part, the ALJ summarized and evaluated Dr. Tecce's medical opinion as
follows:

> In January 2020, the claimant's cardiologist, Marc Tecce, M.D.,
> opined that the claimant is able to lift and carry 5 pounds
> frequently and 10 pounds occasionally sit for 4 hours in an 8-hour
> workday; stand and/or walk for 1 hour in an 8-hour workday; he
> needs to get up from a seated position for 15 minutes every one to
> two hours; occasional foot controls; he needs unscheduled breaks
> to rest 15 minutes every one to two hours; and he is likely to be
> absent from work two to three times a month (Exhibits 11F, 12F,
> 16F and 17F). Dr. Tecce's opinion conflicts with his own treatment
> of the claimant.  Dr. Tecce's treatment notes of the claimant reflect
> that the claimant was doing well; he had fully recovered; and he
> was asymptomatic (Exhibits 13F and 18F). Dr. Tecce did not treat
> the cla[i]mant for his right leg pain. Moreover, although the
> claimant was noted having decreased strength in the right greater
> toe extension and ankle dorsiflexion, he had a normal gait (Exhibit
> 8F). There is simply nothing in the record to suggest that the
> cla[i]mant would be absent from work two to three days per
> month, nor be limited to four hours of sitting per day, and there are
> no explanations for this limitation . . . .

(R. 75).

      Plaintiff contends that the ALJ's supportability analysis – that Dr. Tecce's opinion lacks
support from his own treatment notes, which show that Plaintiff was "doing well," "fully
recovered" and "asymptomatic" – is flawed because the cited notes pertain to his recovery from
his heart attack whereas his ongoing disabling condition stems from the nerve damage to his
right lower extremity caused by the emergency treatments he received immediately following his

13

heart attack.  (Pl.'s Br., ECF No. 10, at 10).  Plaintiff is correct.  At "a *cardiovascular* follow-up evaluation" after Plaintiff's heart attack, Dr. Tecce observed that Plaintiff felt and "appeared well," but the nature of the visit and supporting references to indicators of Plaintiff's cardiac health demonstrate that Dr. Tecce was not commenting on the status of Plaintiff's leg or foot. (R. 1263 ("His blood pressure was excellent.  Cardiac examination is unremarkable.  His EKG is essentially normal.") (emphasis added)).  Dr. Tecce further observed that Plaintiff had made an "excellent" and "miraculous recovery," but the remainder of the paragraph discusses the improvement in his ejection fraction following his cardiac event.  (*Id.*).  He also noted that Plaintiff was essentially asymptomatic from a *cardiac* standpoint: "He has had no recurrent *cardiac* symptoms."  (*Id.* (noting lack of chest pain, pressure or tightness "suggestive of coronary insufficiency;" stable dyspnea; and lack of paroxysmal nocturnal dyspnea, orthopnea, lightheadedness, dizziness or syncope) (emphasis added)).  However, the ALJ does not explain how Plaintiff's healthy cardiac condition serves as a basis to discount the limitations assessed by Dr. Tecce in the Lower Extremities Impairments Questionnaire, such as Plaintiff's ability to sit, or stand and walk, for only one and four hours, respectively, in an eight-hour workday, his need for unscheduled 15-minute breaks every one to two hours, or his likely absence from work two to three times per month.  (R. 1028-29).[2]

---

[2]  The Acting Commissioner points out that "Dr. Tecce's physical examinations do not document any musculoskeletal findings of limited range of motion, joint deformities, muscle weakness, or muscle atrophy" and that his "assessment/plan" lists various cardiac and coronary issues but not right foot drop.  (Resp., ECF No. 11, at 12).  However, these were not the reasons cited by the ALJ for rejecting Dr. Tecce's opinion, and the Court therefore does not consider them.  *See Schuster v. Astrue*, 879 F. Supp. 2d 461, 466 (E.D. Pa. 2012) ("The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision; the Commissioner may not offer a post-hoc rationalization.") (internal quotations omitted).

Regarding consistency, the ALJ acknowledged that Dr. Tecce's opinion comported with findings by Dr. Ng that Plaintiff had decreased strength in his right greater toe extension and ankle dorsiflexion, but she claimed that the former's opinion conflicted with Dr. Ng's findings that Plaintiff had a normal gait. (R. 75). In fact, Dr. Ng specifically found that Plaintiff had an "abnormal" gait. (R. 773). Putting aside this finding, the parties dispute whether the record is generally consistent or inconsistent with Dr. Tecce's responses in the Lower Extremities Impairments Questionnaire, with Plaintiff citing instances in which medical providers documented abnormal gait, right foot drop, neuropathic pain and numbness in the right foot, and right leg and foot weakness, and the Acting Commissioner relying on Plaintiff's activities of daily living ADLs and physical examinations showing benign results. However, "[c]ourts are not permitted to re-weigh the evidence or impose their own factual determinations." *Chandler*, 667 F.3d at 359 (citing *Richardson v. Perales*, 402 U.S. 389, 401(1971)). Significantly for present purposes, the ALJ's stated reason for determining that Dr. Tecce's opinion is not consistent with the other evidence, that it conflicts with Dr. Ng's records regarding Plaintiff's gait, is factually incorrect, warranting remand on this basis alone.[3]

---

[3] Because remand is warranted based on Plaintiff's supportability and consistency analysis of Dr. Tecce's opinion, the Court does not consider his remaining contention that the ALJ ignored "other relevant factors" under 20 C.F.R. §§ 404.1520c(c) and 419.920c(c), such as the length, naturem and frequency of treatment by Dr. Tecce and his specialization. (Pl.'s Br., ECF No. 10, at 12). The Court notes that an ALJ is only required to articulate her consideration of these factors under limited circumstances that Plaintiff does not allege are present here, *see* 20 C.F.R. §§ 404.1520c(b)(3), 419.920c(b)(3), and in any event the ALJ at least mentioned that Dr. Tecce was "Plaintiff's cardiologist" and that he did not treat Plaintiff for leg pain. Nonetheless, in light of my other rulings in this section, I do not decide whether the ALJ's consideration of these factors was sufficient.

2.    **Dr. Mandel**

In relevant part, the ALJ summarized and evaluated Dr. Mandel's medical opinion as follows:

> In September 2020, the claimant's primary care physician, Richard Mandel, D.O., opined that the claimant is unable to lift and carry any weight; he can stand and/or walk for less than one hour; sit for less than one hour; and he will miss more than 3 days per month (Exhibit 20F).  I do not find this opinion persuasive because it is neither supported by the medical evidence in the record nor consistent with the record as a whole. Dr. Mandel's opinion is not supported by his own treatment notes of the claimant. Dr. Mandel's treatment notes of the claimant reflect that the claimant's alignment of the major joints and spine was symmetrical; he had no restrictions for range of motion; he had a normal gait; and he had 5/5 motor strength in all major muscle group (Exhibit 13F). Although the claimant was noted to having decreased strength in the right greater toe extension and ankle dorsiflexion, he had a normal gait (Exhibit 8F).  There is nothing in the record to suggest that the clamant would be absent from work more than 3 days per month . . . .

(R. 75-76).

Again, Plaintiff takes issue with the ALJ's supportability and consistency analysis. Plaintiff asserts that the ALJ's treatment of the supportability factor – that Dr. Mandel's opinion is unsupported by his own treatment notes reflecting aligned major joints, symmetrical spine, full strength in all major muscle groups, full range of motion and normal gait – is deficient because Plaintiff's alleged disability relates to right-sided femoral nerve damage, not a joint or back problem.  (Pl.'s Br., ECF No. 10, at 10).  As Dr. Mandel observed in his Multiple Impairment Questionnaire, Plaintiff's diagnoses include "drop foot right & nerve damage" and his primary symptoms are "pain in right foot & nerve damage."  (R. 1335-36).  Nowhere in his opinion did Dr. Mandel indicate that Plaintiff's limitations resulted from deficiencies in the areas identified by the ALJ in her decision; thus, there is no need for Dr. Mandel's treatment notes to reflect any such deficiencies.  In addition, although the Acting Commissioner attempts to discount Dr.

Mandel's treatment notes documenting Plaintiff's foot drop because they noted it was "stable" (i.e., neither worsening nor improving), she nonetheless acknowledges that this supporting documentation exists.  (Resp., ECF No. 11, at 14 (citing R. 1078, 1085, 1351)).

As for consistency, the ALJ repeated her mistaken assertion that Dr. Mandel's opinion, like that of Dr. Tecce, conflicted with Dr. Ng's finding that Plaintiff had a normal gait.  (R. 75).  As noted, Dr. Ng actually recorded that Plaintiff had an "abnormal" gait.  (R. 773).  In addition, the Acting Commissioner argues that the opinion is inconsistent with "Dr. Tecce's treatment notes which documented that Plaintiff was doing well and asymptomatic from a cardiac standpoint," but this was a reason given by the ALJ as to why *Dr. Tecce's*, not Dr. Mandel's, opinion was purportedly not persuasive. (Resp., ECF No. 11, at 14; *see also* R. 75).  Accordingly, the alleged inconsistency with Dr. Tecce's records[4] is not properly before the Court.  *See Schuster*, 879 F. Supp. 2d at 466.

Thus, the ALJ's failure to properly consider the supportability and consistency of Dr. Mandel's opinion warrants remand as well.

### 3.     RFC

In a related argument, Plaintiff contends that the ALJ failed to describe the evidence supporting the RFC she formulated and that "it is unclear what if any evidence supports" it in light of her rejection of Dr. Tecce's and Dr. Mandel's opinions, as well as her acknowledgement that the non-treating medical sources did not account for all his limitations.  (*See* Pl.'s Br., ECF

---

[4]  Even if the Court were to consider this argument, it would fail for the same reason that the Court rejected the ALJ's conclusion that Dr. Tecce's opinion was not persuasive because it was unsupported by his treatment notes reflecting the improvement of Plaintiff's cardiac condition: Plaintiff's recovery from his *heart attack* does not demonstrate that he no longer suffers from the *femoral nerve damage* allegedly causing his disabling condition.  *See, supra*, § V.A.1.

No. 10, at 13 (citing SSR 96-8p, 1996 WL 374184 (July 2, 1996)[5]; R. 74-75)).  After assigning

weight to the various medical opinions, the ALJ determines the claimant's RFC, which must

include all credibly established limitations in the RFC.  *Ramirez v. Barnhart*, 372 F.3d 546, 552

(3d Cir. 2004) (citing *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)).  Here, after

remand to consider the supportability and consistency of these treating physicians' medical

opinions, the ALJ may formulate a different RFC.  Therefore, the Court does not consider

whether the RFC resulting, in part, from the improperly rejected opinions of Drs. Tecce and

Mandel includes the required "narrative discussion."  *Steininger v. Barnhart*, No. 04-5383, 2005

WL 2077375, at *4 (E.D. Pa. Aug. 24, 2005) (not addressing additional arguments because the

ALJ may reverse his findings after remand).

### B.    Plaintiff's Subjective Statements

In his second issue raised, Plaintiff claims that in determining his RFC the ALJ failed to

properly evaluate his subjective statements.  The Acting Commissioner responds that the ALJ

adequately explained why Plaintiff's subjective statements were not fully consistent with the

---

[5] This Social Security Ruling states in relevant part:

> The RFC assessment must include a narrative discussion
> describing how the evidence supports each conclusion, citing
> specific medical facts (e.g., laboratory findings) and nonmedical
> evidence (e.g., daily activities, observations). In assessing RFC, the
> adjudicator must discuss the individual's ability to perform
> sustained work activities in an ordinary work setting on a regular
> and continuing basis (i.e., 8 hours a day, for 5 days a week, or an
> equivalent work schedule)7, and describe the maximum amount of
> each work-related activity the individual can perform based on the
> evidence available in the case record. The adjudicator must also
> explain how any material inconsistencies or ambiguities in the
> evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7,

remainder of the record evidence.  I agree with Plaintiff that the ALJ's treatment of his subjective statements provides an additional basis for remand.

As part of an RFC analysis, the ALJ must determine the credibility of a claimant's subjective complaints by evaluating the intensity and persistence of the symptoms to determine the extent to which those symptoms limit the individual's ability to work.  20 C.F.R. §§ 404.1529(c), 416.929(c).  Under Social Security Ruling 16-3p, the ALJ must follow a two-step process in evaluating the plaintiff's subjective symptoms: (1) determine if there is an underlying medically determinable physical or mental impairment, shown by medically acceptable clinical and laboratory diagnostic techniques, that could reasonably be expected to produce the plaintiff's pain or symptoms; then (2) evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the plaintiff's functioning.  SSR 16-3p, 2016 WL 1119029, at *4-8 (Oct. 25, 2017).  In evaluating the intensity, persistence, and limiting effects of a claimant's symptoms, the ALJ must consider relevant factors such as the objective medical evidence, evidence from medical sources, treatment course and effectiveness, daily activities, and consistency of the plaintiff's statements with the other evidence of record.  *Id.*

An ALJ is required to "give serious consideration to a claimant's subjective complaints of pain [or other symptoms], even where those complaints are not supported by objective evidence."  *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993) (citing *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985)).  If the complaints "are not fully credible," the ALJ "has the right, as the fact finder, to reject partially, or even entirely, such subjective complaints . . . ."  *Weber v. Massanari*, 156 F. Supp. 2d 475, 485 (E.D. Pa. 2001).  However, "a[n] ALJ must give great weight to a claimant's subjective testimony . . . when this testimony is supported by competent medical evidence."  *Schaudeck*, 181 F.3d at 433.

In finding Plaintiff's subjective statements regarding his symptoms not completely consistent with the other evidence, the ALJ stated in relevant part:

> The claimant's treatment notes reflect that after suffering a heart attack, the cla[i]mant reported to be doing well and asymptomatic (Exhibits 13F, 18F and 22F).  His blood pressure has been normal. Moreover, although the claimant was noted to hav[e] decreased strength in the right greater toe extension and ankle dorsiflexion, he had a normal gait (Exhibit 8F).  The claimant testified that his primary care physician and cardiologist have informed him to not to "overdo it" and not to overexert himself.  The claimant's treatment notes reflect that he was encouraged to exercise (Exhibit 13F).  Moreover, it was noted that the claimant was able to manage his personal care, shop, prepare meals, maintain housework, do the laundry, and drive safely.  His activities of daily living are not inconsistent with the ability to perform the exertional requirements of sedentary work.

(R. 74).

As Plaintiff observes, the ALJ's evaluation of his subjective statements suffers from some of the same defects as her evaluation of Dr. Tecce's and Dr. Mandel's opinions.  First, the fact that Plaintiff was "doing well and asymptomatic" from a *cardiac* perspective "after suffering a heart attack" was not substantial evidence to determine that his statements regarding the intensity, persistence and limiting effects of his *femoral nerve damage* were exaggerated or unfounded.  (R. 74; *see*, *supra*, § V.A.1 & n.4).  Second, the ALJ's assertion that Plaintiff's subjective statements conflict with Dr. Ng's records reflecting a normal gait lacks substantial evidence.  The cited neurological results from Dr. Ng's physical examination of Plaintiff flatly state: "**Gait** abnormal.  **Wearing AFO [ankle foot orthotic].**"  (R. 773 (emphasis in original)).  Third, the ALJ cited results of physical examinations of Plaintiff by Dr. Mandel showing no joint or back problems, but these are not substantial evidence to reject Plaintiff's subjective statements regarding the effects of his right leg nerve damage, which was also documented by Dr. Mandel. (R. 1335-36 (Multiple Impairment Questionnaire listing Plaintiff's diagnoses as "drop foot right

20

& nerve damage" and his primary symptoms as "pain in right foot & nerve damage")). The Acting Commissioner also highlights the ALJ's observation that Plaintiff's foot drop was "stable," but the fact that it was not worsening was not a basis upon which to disregard Plaintiff's subjective complaints regarding the effects of the foot drop. (Resp., ECF No. 11, at 17 (citing R. 1078, 1085, 1351)).

Further, the ALJ's discussion of Plaintiff's ADLs, including his personal care, shopping, meal preparation, housework and driving, ignores Plaintiff's testimony regarding his minimal capacity for these activities. For example, he does "not really" do any grocery shopping and is limited to buying only "a gallon of milk or some bread." (R. 100). His house chores are limited to loading the dishwasher, wiping down the table and folding the laundry, but his wife, parents, and in-laws handle most other tasks. (R. 102). Plaintiff is able to drive, but only "short communal drives[.]" (R. 92). He has been medically advised to exercise, but warned "not to overdo it and not to overexert himself." (R. 74 (citing Ex. 13F); *see Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988) (reversing summary judgment against the claimant and remanding case where he "took care of his personal needs, performed limited household chores, and occasionally went to church")).

In addition to the reasons for discounting Plaintiff's subject statements proffered by the ALJ, the Acting Commissioner submits that the statements should also be disregarded because Plaintiff never saw a specialist for his right foot drop or followed up with a neurologist as recommended by Dr. Mandel. (Resp., ECF No. 11, at 17 (citing *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983); *see Dumas*, 712 F.2d at 1553 ("The Secretary is entitled to rely not only on what the record says, but also on what it does not say."))). The problem with this argument, however, is that the ALJ did not articulate any reliance on these facts. Instead, she

provided the above-stated bases for her decision, which fail for the reasons identified.  Because the Court is limited to reviewing the reasoning actually set to paper by the ALJ, the Court does not consider Plaintiff's failure to seek treatment from a specialist or neurologist.  *Schuster*, 879 F. Supp. 2d at 466.

In sum, remand is also warranted due to the ALJ's failure to properly consider Plaintiff's subjective statements.


**VI.    CONCLUSION**

For the foregoing reasons, I find that the ALJ erred by failing to properly consider: (1) the supportability and consistency of Dr. Tecce's and Dr. Mandel's opinions and (2) the subject statements of Plaintiff himself.  Accordingly, Plaintiff's request for review is **GRANTED** to the extent that it requests remand. This matter is remanded to the Acting Commissioner for further proceedings consistent with this memorandum.


BY THE COURT:

  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge

22